Good morning, Counsel. Good morning, Your Honor. David Gauntlet for the Plaintiff and Appellate. I'd like to reserve three minutes for rebuttal. This case is readily distinguishable from Swift for five reasons. First, Swift addressed a pure palming-off vaccine area where the insured multi-carts promotional statements, characterized as mere puffery by the court, did not include any negative comparative statements. Even in the extrinsic evidence, which the court chastised the Court of Appeal for not reviewing. Second, here by contrast, the extrinsic evidence includes the deposition testimony of the claimant's officers at ARC. Third, ARC's CEO acknowledged that they sought to truncate their allegations and deposition testimony to avoid triggering C2's defense rights in light of C2's success in the last two lawsuits with them in securing defense fee reimbursement, and this attack was manifested by the way in which ARC's officers failed to recollect with specificity the actual false and misleading statements. Counsel, I hate to interrupt you, but let me just ask you this question. If when I read Swift, I think it does cover this case, that's kind of the end of your case, isn't it? And insofar as, if Swift covers it, you lose. Yes. Okay. Hence the five points regarding Swift, Your Honor. Okay. And again, Swift was a very distinguishable fact scenario. I wrote an article called The Case for All Seasons when it came out because the three cases it distinguished, my cases, Burgett and Epiphany and Michael Taylor, when read in conjunction with the facts revealed through extrinsic evidence, which the district court selectively reviewed, but did not fully parse in its analysis, evidence is an important differentiator. Real simple. Cheaper, faster is what comes through as a message if you go to C2. Since the Babylonians, that's been deemed an important differentiator to consumers. Moreover- What about the Babylonians? Well, generally, if you told somebody a product was less expensive, it could get more quickly, that would make that product a preferred one if there was more than one in the marketplace. Even if it's a clay tablet, right? Clay tablets are maybe the best fish from the river. There you go. Okay. So- So- The point is that there's a special position that Stinson had when he joined C2 because as the allegations, the complaint revealed, much like a only producer of a product, he had knowledge of the particular needs of the customers, the particular wants- Right. But can I have you back up because I didn't get your argument on how this is not a SWIFT case. SWIFT was a palming off case. It specifically said this is only about products that replicate the same product that the claimant was selling. There was no negative comparative fact allegations about communications made to consumers- Is there any material difference between the policy provisions at issue here and the policy provisions in SWIFT? One key aspect is that we're also arguing defamation, which was not at issue there. The same policy was at stake, but no defamation argument was offered in that case. But what you've got to- Wait a minute. You're saying that the defamation, what do you refer to the defamation portion, exclusions in the policy were different or there weren't any? No, no. Forget exclusions. We're talking about coverage. Coverage. Okay. So- Coverage under B. Well, just- And there's two elements, defamation and disparagement, that we argued to the court. Well, defamation is harder to prove than disparagement. Less, actually. If you look at Mead and you look at the analysis of Mead, you don't have to establish all of that. It's much narrower than defamation. Look at Mead and KM Strategic. That's why the- Well, can we talk about disparagement for just a minute? Yes. Tell me, what is it that you say that, what is the basis for the disparagement claim? What statement? The statements are inferred and inferences are appropriately drawn from the allegations, as understood in the tortious interference count, when looking at the extrinsic evidence that basically said that consumers understood they were going to get a faster, cheaper product if they went with C2. And the actual statements where that was said were not articulated in the deposition testimony or the complaint, but they don't need to be, as long as they can be reasonably inferred from the consequences. Okay. So on appeal, can you show us where those statements are that we can infer this disparagement? Yeah. If you go to the arguments that I have at section- You're pointing in these two things that are in the record, evidence that are in record, and you're not giving us your appellate argument about that. No, no, no. I'm- Okay. Okay. So if you go to the docket, page 25 to 26, section 3E, and docket 18, page 16 to 17, section 2C3, I articulate the extrinsic evidence, which is a deposition testimony from ARC executives, which are not aspects of the extrinsic evidence which the district court bothered to look at, because it was applying a dickball kind of analysis. So you're relying entirely on extrinsic evidence. Not entirely. Okay. Well, tell me the evidence of the statements. Tell me what statements you say are disparaging. The statements are inferred from the testimony of the executives, ARC's explaining that they understood statements were made that had the effect of causing people to believe that the products were going to be cheaper and faster as acquired- That sounds to me like extrinsic evidence. Yeah. That's extrinsic evidence. Okay. You said, but I'm not relying entirely on extrinsic evidence. So tell me the statements that you rely on. They're not extrinsic evidence. I don't need statements to be extrinsic. Okay. Okay. I thought you said you had them, though. If you don't need them and you don't want to tell me about them, fine. Go on to another question. Don't tell us about them. Well, they're implied, and that's all we need to be. Okay. You don't have statements, but you have implied statements. I have implied statements, which are all you need that are extrinsic from the deposition testimony, which are part of the tortious interference count. And you have to understand that tortious interference is not a cause of action. It's a remedy for underlying tortious conduct. And here that underlying tortious conduct arguably is disparagement and defamation because that's the impact of those statements. So in the Miranda case, as an example, the court said, these are Christie's cows. That was enough for defamation and disparagement because it turned out that that led to a certain quality when they didn't have that quality. There was a disparagement of the cows and a defamation of the source of those cows. That's the kind of scenario we have here where the exact precise words are not stated, which appears to be, as the CEO states, for the reasons that this case is analogous to Dobrin and Hudson and market lofts, situations where they truncated the fact allegations behind the tortious interference counts to avoid trying to trigger coverage, which doesn't eliminate the fact that they sought relief based on the same conduct. Counsel, when you tendered the claim to the insurance company and sought a defense, were all of these implied allegations set forth for the benefit of the insurance company? On numerous occasions because it was letter-writing. And the answer is yes? Yes, absolutely. They were all there? They were all there. And where in the record should we read exactly what was said on the two different tender occasions? Just look at the correspondence that was provided to the insurers. That's why I'm asking you the ER number.  I don't have that handy, Your Honor, but it's right at the beginning of the ER because there are exhibits to the coverage complaint itself and incorporated as exhibits right there. And to just be clear, so I'll just look at the top deposition as an example, and they say when he was asked if he believed that C2 intended to create a false impression in customers' eyes, the connection between C2 and ARC said, we have a great brand because we do a great job for our customers. And C2 is associating themselves with us, and they're implying that they're bringing that quality to C2. And I resent that because they're not. That gives rise to the JAR Laboratories' approach to a misstated and contested allegation of equivalence. Was this deposition taken before the tender or after the tender? Before the tender. There was a retender, and in the retender, it was incorporated. And it is only present counsel who has decided that those fact allegations, when parsed, have to be evaluated in light of the other ones that the court focused on. And the problem with that is there's a serious mearpad issue with this case. If you look at the extrinsic evidence the district court relied on and compare that with the actual testimony that is exerted on those pages in my reply brief, you'll see that they're, at best, from the insurer's perspective, equivocal. And if they are, according to mearpad, subsequently affirmed by the Cal Supreme Court, that evidence that there's a factual dispute as to the nature of what the statements were, that means we win. It doesn't mean you can't enter summary judgment. Counsel, do you want to say anything? You asked me to help you with your time. Didn't you say five minutes you wanted to do? Three. All three, sorry. And so that's an important aspect. But even if we look to the best statements that you have in the record, at most it's an inference, right, which then brings us back into whether SWIFT applies or not? Or do you have a statement that has the level of specificity that would be required if we applied SWIFT? I think those the inferences from those statements do have the level of specificity when you look at what they say. So Toss says, they had done something that changed customers' perceptions regarding C2, namely C2 offers a better value of some sort compared to ARC. He doesn't say, I heard them say that. He says, I understand that they advised people that there would offer a better value of the sort compared to ARC. Now, that's pretty close to him parroting the exact words. He's parroting his understanding of what the words were. That's what inferences are all about. And remember, in California, unlike Maryland, unlike other jurisdictions, facts that evidence the potential for amendment of the complaint are sufficient as are inferences derived not only from the facts in the complaint but from extrinsic evidence. If you look at that statement, C2 offers a better value of some sort compared to ARC, and that that's what was communicated. That's what your client says he understood the statement to be. No, that's the testimony of Toth, ARC's executive, complaining about why they were suing CT in his deposition. Okay, but it's okay. So he's got the perception of what these statements were. They just don't happen to know what they all were. That happens in a lot of lawsuits. But nonetheless, you can be a victim of a disparagement claim when you learn the effect of statements that are misleading and are untrue according to your understanding of the facts. And inferences from what you do know suffice to evidence that there was sufficient statements to be an implied disparagement claim. If you require more than that, you really take away the whole point of the inferences. I would like to reserve the rest of my time. Okay, very well. Bear with me, I'm late. Good morning. Good morning, Your Honors. May it please the Court. Scott Veselosky for Golden Eagle. You like Swift. Very much so. Very much. I like Swift, and I believe just to kind of cut to the chase if we can, what C2 has failed to do in all of its briefing as well as in oral argument to the Court is identify the false or misleading statement that specifically referred to AHRQ's business or products and clearly derogated the business or those products. Well, as I understand what your colleague on the other side says is we don't have to – I don't know that he's quite said this to me, but he hasn't given me the statement. But he said you can imply from these what was said, and we have a witness who said that's what he implied. He implied disparagement, and so isn't that sufficient? So what do you say about that? It's not under Swift, and that's because what Swift allows is you can make an inference from a statement, but there still has to be a statement. Right. So you can make an inference from a statement, but you can't infer a statement. And so what counsel is asking us to do is to actually infer evidence, and that goes against Swift. Well, I think in fairness what he's saying is that the witness couldn't remember exactly what was said, but what the witness thought was said was something that was disparaging. Right. And Swift addresses that. And what Swift says is that the specific reference requirement limits the right of action for injurious falsehood, granting it to those who are the direct object of criticism and denying it to those who merely complain of a nonspecific statement that they believe caused them some sort of hurt. That's what we have. We have a nonspecific statement that they believe may have caused them some sort of hurt. And by the way, it's not tied to actually anything that was brought in the ARC complaint. ARC didn't allege any facts that would support a disparagement claim. They didn't have a cause of action denominated as disparagement. There was nothing there. And so when Golden Eagle gets the retender, they look at deposition testimony where you have an ARC employee saying, well, you know, I think they may have said something. And then if you look at the rest of the transcript, which is before the court and excerpted almost entirely in our brief, there's follow-up. Well, what was said? I don't know. Who would know? I don't know the particulars. I don't know what was actually said. Well, who would know? I'm not sure. Maybe Stinson would. Are you saying that they're disparaging the quality? No, I'm not saying that. So there's no there there. There's no false or misleading statement where we can actually even draw some sort of an inference. And in SWIFT, what was important there is the court explained that, you know, the requirement, the specificity requirements must be satisfied by express mention. We don't have that here. Or clear implication. And in talking about clear implication, what did the court say? The court said that disparagement by a reasonable implication requires more than a statement that may conceivably or plausibly be construed as derogatory to a specific product or business. A reasonable implication in this context means a clear or necessary inference. And it only gave an example of one instance where this works, one, and it's cited to Epiphany and Burgett. And in those cases, you had a competitor who, again, was making a statement, and they were saying that I have the superior feature to the exclusion of my competitors. My competitors don't have this. I'm the only one. I'm the only one that has this source code. I'm the only one that has this trademark. And the court said, well, you know, under those circumstances, we're going to say that that's going to satisfy the specificity, the two-part test, that we're saying that a party has to meet in order to state a claim for disparagement and trigger coverage. And they said, we're going to say that works here because that's specific enough to say that, well, if you're saying that you've got this to the exclusion of everyone else, well, that means your competitor doesn't have it. And you're disparaging them by doing so, by saying you're the only one. We don't have that here. And they admit that they don't have it in the complaint. They identify instead extrinsic evidence that they believe we're supposed to glean a statement, but there's nothing there. They want us to infer it based upon assumption and then speculate about a cause of action that was never brought, admittedly never brought, nor tied to any cause of action actually or any of the facts actually alleged in the complaint. But without these critical elements, the C2's claim for coverage fails. Can I ask you a question? Absolutely. Why didn't you move for summary judgment yourself? I've never heard of this requesting sui sponte grant of summary judgment. I mean, it seems to me, why not just request grant of summary judgments? Because it really isn't sui sponte because you put it to the district court. Maybe this is typical in California. I don't know. So it does happen. The Ninth Circuit has affirmed a district court order under analogous facts. A district court, as long as everybody has noticed, can grant it truly sui sponte. But what I was struck with in this record is you filed some paper asking for a sui sponte grant. Right. So what happened in this case is approximately two weeks after counsel for C2 served my client, they filed a motion for summary judgment. Right. So before we had even answered or appeared into the case, they asked for summary adjudication on the duty to defend. We responded by opposing it to know that there is no duty and also cited to the cases, including cases from the Ninth Circuit, which allows a district court to enter sui sponte summary judgment for the opposing party when there's only one eventual result. Right. And that's what happened in the Azarkey case that we cited to. I'm not being clear. I'm not suggesting that you, that the court couldn't do it. But what I was just curious about is why didn't you just move, cross move for summary judgment? Because they filed the motion two weeks after service before we had even appeared into the case. And this is, I mean, I could go into more, but it's outside the record. What is in the record, you know, is that. You thought there was a timing issue. Well, correct. I mean, there was no ability for me to oppose it and file a cross motion at the same  time. You know, now if the court didn't grant it sui sponte, of course, I would have filed my own motion. I didn't need to because there is a case law that allows me to seek sui sponte relief as such. And as mentioned, there is the access from the central district. There's agri-key, which the Ninth Circuit affirmed that allows us. So anyway, to answer your question, yes, that's the why. Okay, thank you. Very beginning, very beginning of the case. So in any event, you know, here what we don't have is extrinsic evidence that's tethered to any factual allegations in the case. We don't have extrinsic evidence that meets the SWIFT's two-part test. They assert arguments that this court as well as California courts have repeatedly rejected time and time again. At most, what they say is they raise an argument of equivalence, consumer equivalence. To me, that sounds like the antithesis of disparagement by saying, I'm just as good as them. Well, you're saying they're good, and you're trying to compare yourself to them. And that's not disparagement. Just last year in KFX, this court rejected a similar argument where – excuse me, not last year. It was a couple years ago in Bullpen where this court rejected a similar argument where the defendant was accused of passing off the plaintiff's accomplishments, its process, as its own. They were trying to say that, hey, you know, we're doing the same thing, and these accomplishments are our accomplishments. And they actually had statements, though, and this was actually alleged in the complaint, which, again, we don't have here. And this court said, that's not enough. That's not disparaging. There's no distinct disparaging derogatory comment that's aimed at the competitor, and because of that, you don't have a disparagement claim, and because of that, you do not trigger coverage. One other point, you know, they've raised a defamation, coverage by defamation for the first time, you know, on appeal. We addressed this point in our brief. This was not raised in their complaint. It was not raised on summary judgment. And in any event, even if it was properly before the court, there is nothing, admittedly nothing in the ART complaint that no facts that would have supported a defamation case, not in the extrinsic evidence. There's nothing there that would point to any kind of defamatory statement. And California courts recite to Juan Nichols, which says, you can't infer defamation. That's clear. A couple of cases that they cite to as well say the same thing. You cannot infer defamation. I recognize I do have additional time, but I believe I've addressed my main points unless the panel has any questions. I don't think we have other questions, counsel. Thank you so much. I just ask that the court affirm the district court's order granting summary judgment for Goldman. Thank you, counsel. Thank you very much. Thank you. So you have some rebuttal time. So if the court looks at those pages from my reply brief, I think what you'll find is there's a disconnect with the way that they've represented what the fact allegations are, what the district court focused on, and what is actually included. So there's statements that in the deposition testimony that misinformation was given to the consumer with respect to ARC in order to entice the customer to purchase a C2, and that this representation led them to understand that C2 was, if not equivalent, in fact, better because it was faster and cheaper. And if you look at those allegations in the complaint, those are tortious interference games. Look at Lockheed. Lockheed says you have to look at the underlying tort. The underlying tort here is evident in what occurred when the deposition testimony was taken, which was made known to the insurer, and they simply only looked at aspects of it. When there's a spectrum of possibilities, and one is the statements were disparaging and the other is they were not, that spectrum means there's a fact dispute. That fact dispute means we're entitled to a defense. Defamation was properly raised in the motion for reconsideration because the response in nature meant that that was the first time a defamation issue would have been adjudicated against us. We were entitled to oppose that. We did meet analytics and CAM strategic evidence. You don't have to have all elements of the claims for defamation to establish potential coverage, and that you can readily infer on the facts here what the statements were that would have necessarily been requisite to have had the assumptions about what parties, and that's what the potential for amendment doctrine in California has been about. Also, if you look at the very last part of 299 to 300 of SWIFT, you'll see that there's a specific reference to an important differentiator. It doesn't have to be I have a better product. It can be this person who has all my secret information, knows who I am, knows what I'm going on, has access to a better product and a quicker product, and that positioning makes it analogous to the situation where you have the only source of supply meeting the important differentiator criteria, which is an element to meet the inferences required under SWIFT. Very good. Thank you, counsel, for your argument. Thanks to both counsel. The case just argued is submitted.
judges: Motz, M. Smith, Nguyen